Good morning, Your Honor. David Ettinger for the appellant. May it please the Court. The first question for the jury in this case was whether Transbay had received from Chevron a bona fide offer for buying the service station property at issue in this case. The jury found that the offer was too high, but it did so without a critical piece of evidence. That piece of evidence was an appraisal that valued the property higher than Chevron's offer, which Chevron had an appraisal of its own, right? Chevron had an appraisal as did Transbay have an appraisal. Transbay's was for the trial purposes. Chevron's was for what the offer was based on. So you wanted essentially a second appraisal that Well, this, what was important about this one You don't want to let me finish? I'm sorry, Your Honor. Aren't you even curious as to what I might be I thought you had finished. I'm sorry. Usually people stop talking when they're finished. So you wanted a second appraisal where you couldn't, the other side couldn't cross-examine the appraiser. That's your complaint, right? Well, we wanted the second appraisal. What was important about it were two things. It was the one Why don't you answer my question. Then you can tell me what else you wanted to tell me. You wanted to put an appraisal where they could not examine the appraiser. We wanted this appraisal in. They could have called the appraiser if they wanted, or they could have discussed it with their expert. But the important thing about Well, normally the people who rely on appraisal are put, present appraisal, and they present the appraiser. Sometimes they make them available for depositions and present them in court. They can be cross-examined. You wanted to sort of bypass all that, or your client wanted to bypass all that, and put an appraisal where none of that was available. If they wanted to, they could have tried to subpoena the appraiser, I guess. Well, the It's a little unorthodox. But when you are introducing a piece of evidence as an adopted statement, as we were doing in this case, you are not typically going to have cross-examination of Well, exactly. I mean, that's what you were trying to do. You were trying to put an appraisal that wouldn't be subject to cross-examination. That was your objective. It seems a little sneaky, but, hey, if you, you know, can do it. Well, it was — it's more of a byproduct than our objective. The objective was to put in an appraisal that Transbay itself had used. You could have done it another way, though. Here's what I view has happened, and then you can tell me if I'm wrong. What happened was, in the pretrial proceedings, the trial court was apparently treating it as an adoptive admission. But then you get to trial time, and the judge has an out-of-the-presence-of-the-jury hearing where he listens to the principal, and he obviously believes him. In other words, he never looked at this appraisal. He simply got in — he was in a rush, and the next bank said, you've got to get here with your He didn't know what was in that appraisal, so, therefore, he said, it's not going to come in as an adoptive admission. So you were out with regard to getting it in that way. You could have, of course, noticed that appraiser as an expert, and you wouldn't have to worry about whether you get it in as an adoptive admission. You could have noticed him as an expert, and he would have been subject to cross-examination, and you could have tried to get it into trial directly. But you, because of the fact that the judge, at the time of trial, then found this — the plaintiff to be credible, but not in an adoptive admission, and you were out, because, of course, then you couldn't notice as an expert. That's the way I see the case. Am I wrong? Well, I think — I think you are, Your Honor, because the — the record when the court — when the district court made its ruling at the summary judgment motion was essentially the same as it was — Well, he didn't have the — he didn't have the plaintiff testifying, though. There wasn't — and obviously, he felt that the plaintiff was testifying to the truth, which seemed a little improbable, but he obviously believed him once you were at trial. At the summary judgment, there wasn't any credibility finding with regard to the plaintiff. That's the difference, I think. Well, but the — the plaintiff or the plaintiff's — Transbay's owner had submitted a declaration saying the same thing as he testified on Fordeer during — during the trial. But the critical point is that the judge at summary judgment — and I think this was the correct way to analyze this — was she said, on the one hand, we have the — we have Transbay submitting this appraisal for the purposes of getting a loan, and that establishes — that is evidence of an adopted statement. Then she said, on the other hand, we have his declaration saying that he never read it, which, she said, on — suggests that it's not adopted. She said, this is for the jury to decide. And — and that's the correct — that's the correct approach. That was the correct analysis. Well, the court — the court has to make an initial evidentiary determination. That's why he had a hearing out of the presence of the jury, and he bought what the guy said. And that's why he didn't come in. Well — The jury isn't going to decide the admission of evidence on that. Well, two answers to that. First, there was contradictory testimony from the — from Transbay's owner as to whether he had read the appraisal before submitting it. On the one hand, he testified at trial that he did not read it. But on the other hand, at deposition, and this is in the record, he said that he — he admitted that he saw the appraisal before the deal closed. But second point, and probably the more important one, is whether or not he read it. This — this circuit has used the possession plus standard for adopted statements, meaning that just having it in your possession is not enough. You have to do something with it. And here, it's uncontradicted that Transbay did something beyond possession. They submitted that — that appraisal to the lender to get a loan, to get a loan, and that appraisal was for more than what they're now contending. It was an inflated price. Mr. Reese, you had listed on your witness list representatives from the lender, California Pacific Bank, but when the district court reversed its ruling mid-trial after listening to Transbay's owner, why didn't you call someone from the lending institution to say we looked at it and we relied on it because it was part of the loan application that Transbay submitted? That's — that's a good question. Well, I know it's a good question. To which I didn't — What I'm looking for is a good answer. Yeah. To which I don't — I don't know the answer. But we thought that it really would be — after — after the court had twice ruled that this was admissible as an — just before opening statements, it really seemed unnecessary. And also — And after the court said, I'm not going to allow its admission as an adoptive — Well, this was — — exception to the hearsay rule? At the end of trial. This was the last witness, I believe. Well, did you still have somebody from the bank on standing by in case you needed to call that person as a witness? That I don't know. Okay. But we also had, in addition to the — to the district court's two previous rulings on this about — that it would be admissible as an adopted admission, we also had a stipulation from — from Transbay authenticating the appraisal. So it — it really didn't seem necessary to — to have to call anyone else for it. Well, it — what strikes me is unusual. I mean, we've all tried cases, and — and trials can take some odd turns sometimes. And that's why you hedge your bets, and you have a standby witness ready to go on the stand, depending on how the testimony comes in. We — we thought we had Belton suspenders. We didn't have the second pair of suspenders. And we had — I mean, it may have been, I suppose, that the testimony would not have been favorable. In the portion of the record I read, it looked like he got the loan in 15 minutes by a handshake with the chairman of the bank. I'm not sure what — whether that's an approved lending practice, but I guess you could get a loan that way. The way I read the testimony is that it took at least three days before he got word of approval for the loan. Okay. I see my time's expired. Are there any other questions? I'd be glad to answer them. We'll hear from the other side. Thank you, Your Honor. May it please the Court, Samuel Reese on behalf of Transbay Auto Services, owned by Mike Zachris, who's in the Court. I want to try and be brief. This is a PMPA case. It has always been a battle of the appraisers. Both sides knew it was a battle of the appraisers. Chevron had their appraiser. We had our appraiser. When their appraiser got chewed up on cross-examination, they decided to backdoor an expert by getting the PSG appraisal in. Well, they had a ruling from the district court, a summary judgment. It was a pretty good bet at that point. Well, the summary judgment was based upon a statement saying by Mr. Zachris, who English is not his first language, a statement made by Mr. Zachris in his deposition. Mr. Zachris then ---- Who said that he saw the appraisal? It could be read a couple of different ways. One way is he actually saw the appraisal document. One is, as he testified at trial, he saw the envelope that he had believed had the appraisal in it, which is what he went through in detail on both his cross-examination following direct and on his ---- on the voir dire cross-examination. Why doesn't that make that any jury issue? If he's made statements under oath that can be read as saying, can be interpreted as saying, yes, I saw and read the appraisal, why wasn't the district court required to give that to the jury? And then he could have argued language or whatever, and the jury would have decided. He never said he read it, not in any of the testimony. Well, he said he saw it. You know, you can read saw in any number of ways. You can say, I saw it from a distance. I saw the envelope. You can say, yeah, you know, I saw the way I sort of remember the transcript. We were reading another case. I saw that transcript, you know. I actually read it, you know. Why is that a jury issue? Why is that the kind of thing you give to a jury, and then the lawyers stand up and say, saw means one thing, and you say, you know. It's not a jury issue because this is not a game of tag. It is not a situation where because ---- What kind of answer is that? It's not a game of tag. I was ---- You've got statements from your own client that seems to contradict what he testified to, where he ---- I believe that my client ---- What difference does it make anyway? I mean, let's say he didn't read it. So what? I'm sorry? Let's say he, in fact, didn't read it. So what? He submitted it. He submits it to get a bank loan. Why isn't that, when he submits a document, he submits a document for purposes of getting the bank to give him money? Why is he bound by whatever is contained in it? That was not what he testified that he did. I'm happy to tell you, he testified that because of his relationship with Valero, after he was turned down, what he thought ---- I know what the record says. He ---- No dispute that he handed, I mean, even by his own account, that he hands the envelope with the appraisal, along with other papers, to the bank in seeking a loan. Is there a dispute on that? He handed them because they asked him to bring whatever you had. And they put it on the shelf, just like Mr. Sakharov did. Why don't you answer my question, and then he can talk about it all he wants. I'm trying to. Is there any dispute that he, in fact, brought the document to the bank and handed it along with his loan application? Is there a dispute on that score? He didn't do a loan application, but no, there is no dispute that he handed the envelope. He got a loan without a loan application? Yes, he did. He went to apply for a loan, and he provided a bunch of documents. He testified ---- Did he hand over this document? He brought in the two envelopes. He sat down with the chairman, who had already discussed, presumably, with Valero what was going on. They had about a 15-minute discussion. There was an issue with regard to whether or not Mr. Sakharov said that ---- Did he hand over the envelope with the appraisal? He handed over the envelopes. Okay, stop. The chairman took the envelopes. Stop. When he hands over the envelope during the loan application process, why isn't that enough for him to be ---- to have adopted it? Well, among others, if we're looking at not Mr. Ettinger's possession plus, but what Arellano Blanco and Monks and the other decisions of this Court say, see or hear, understand, exceed in order to have a manifestation. He never saw it. He certainly didn't understand it because he never read it. And we're not talking about the fact that there is a document in there. We're talking about ---- Is there any case where somebody used the document this way, rely on it, you know, hand it over in part of the transaction? All of those are possession cases. There are cases involving mere possession. But here he actually hands it over. I don't see why that's enough. I mean, let's say, for example, this was fraudulent, and the FBI then comes after him for defrauding a federal institution, an insured federal institution. It turns out the document is completely fraudulent. Could he say, well, sorry, I didn't read it? Does that get him off the hook? He's submitting this stuff to get big money from the bank. Why isn't he bound by what he says in it? Well, what the other side is trying to do ---- Why don't you forget about the other side? Why don't you answer my question? Why isn't that? Because it's not his statement. It's not his fraud. It wouldn't be his fraud on the bank to begin with. It's not his statement. Now, if he wrote in a loan application something that's fraudulent, yes, they can come after. Let's say there is this loan application, and he signs it, and he later says, you know, I didn't read it. My accountant, my business partner put it in front of me. I didn't read it. I didn't understand it. I don't speak English so good. Anyway, I just knew I had to do this to get a loan. I signed it. We look into the question about whether he thought about it. Are you smart enough to understand it? No. Clearly, on a fraud basis where you're looking at intent, if you've got somebody who is being a messenger boy from an accountant to somebody else, that's a little difficult to prove. This is not just a messenger. This is the applicant for the loan who is asking the bank for a million and a half dollars or whatever it was, and he's being asked by the lender to give me whatever documentation you have to support my decision as to whether or not I'm going to give you the loan. Why isn't that sort of a classic example of an adoptive admission? He is proffering this appraisal to induce the lender into giving him the loan, is he not? No. He is trying to comply with what this individual had told him, which is bring me whatever you got. He didn't say bring me an appraisal. Or else I won't give you the loan. No, he just said- How isn't that when he complies with a guy who's got the money and he does what the guy says, how isn't that, in fact, giving him the stuff to get the loan? That wasn't the basis upon which he got the loan. He carefully explained the basis that he got the loan. How do we know that, though? I mean, I read his testimony, but, you know, Mr. Edinger says, well, it took him three days to process it. So the fact that the chairman scheduled the closing two weeks hence doesn't necessarily mean that the bank couldn't have backed out of the loan, does it? You're absolutely correct. The bank could have. And I wanted to answer the question that you asked the other counsel, which is why didn't they put on the chairman of Cal Pacific Bank? And they clearly could have done that. And the chairman, we believe, would have supported Mr. Sackers' testimony and said, I never looked at that. I didn't care about that. I just told him to bring me whatever he got. I made the loan based upon other reasons. What difference does it make whether the bank actually relied on it? I mean, if he has a loan application, he signs it, and they say, oh, you know, we didn't look at it. We just like your face. We're going to give you the money. It doesn't really matter whether the other side actually relies on it. The point, the question is, does he rely on it in trying to get a loan? At that point, he's adopted it. Why isn't that then the case? I believe the bank would have complied with federal law and had their own appraisal done. So you think you're entitled to put in a fraudulent appraisal and say, oh, well, you know, I can't because the bank is going to get its own independent appraisal? I don't think the FBI views it that way. No. I think you put in a fraudulent appraisal, even if the bank is required to and does do its own appraisal, I think you can get prosecuted for fraud. I'm certainly not suggesting anything like that happened here. I'm just talking hypotheticals. You are responsible for the stuff you give the bank in getting a loan. Isn't that the end of the matter? I think you're clearly responsible. Whether the bank relies on it or not, whether the bank has other ways of checking information or not, you are responsible for the stuff you hand over to get a loan. I think you are responsible for the statements that you make to the bank, whether they are in orally or in writing, and those must be truthful. This is not his statement. It's not something he even knows about. It's not – the point is they're trying to use this to say that Mike Sackris agreed that this is the value of his station. And that's where you get back to the Arellano Blanco and the Monks and all the other ones. It's not just taking some document from one place to another without looking at it. It's the fact that he – to establish it as an adoptive admission, they're going to have to have some evidence that he saw the number that is contained in that appraisal and then somehow acted upon it. He didn't act upon it. He didn't say to the chairman of the bank, gee, take a look at this great appraisal. I know you'll give me the loan. That's not what he did. He said, basically, I know your relationship. I'm good for the loan. You know Valero. I need this money. You're my last hope. And the guy charged a very high interest rate. And he said, I'll take it, because that's all I can get. He just wanted the loan. And when he walked out of there and got the handshake by the chairman – You could have said, I'm good for it. I don't know about this appraisal. I haven't looked at it. I don't know. I'm not going to give it to you. Give me the loan anyway. He didn't do that. No. He said, whatever you ask me for, I'll do. And if you want me to do backflips, I'll be happy to do backflips. At that point, you're stuck with the backflips, aren't you? Well, yes, but it's not fraudulent, at least. You fall on your head at that point. At that point, you're stuck with the consequences. It's not fraudulent, at least. I apologize. I'm over my time. Thank you very much. I think you were out of time, too, but I don't remember. We'll give you a minute for a bottle in any event. How about that? Thank you, Your Honor. In his deposition, this was the question and answer. And so you did see a copy of this appraisal that we've marked as Exhibit 106 prior to when you closed on the deal. Answer, yes. If, as it should have been, the appraisal was admitted into evidence, he certainly could have explained, just as he did in the voir dire, how he didn't read the appraisal. But that was for the jury to weigh how much weight to give to the appraisal and how much weight to give to his statements saying that he did not rely on this appraisal. But the fact remains, and it is uncontradicted, that he submitted this appraisal to the bank to get his loan. That is the plus of Possession Plus. Thank you. Thank you. Thank you, Your Honor. The case is now in a stand-submitted.
judges: Piersol, Kozinski, Tallman